## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**DIWANN MATHIS and MARKETA MATHIS,**
individually and as parents and natural
guardians of minor children **D.M. and D.M.,**

8:25-cv-3334-SDM-NHA

           **Plaintiffs**

C.A. No.

    **v.**

**JURY DEMAND**

**FREIRE SCHOOLS;**
**KELLY C. DAVENPORT,** in her individual capacity;
**LEIGH BOTWINIK,** in her individual capacity;
**OLIVIA BURGESS,** in her individual capacity;
**JAWANDA MURRAY,** in her individual capacity; and
**JOHN DOES 1-5** and **JANE DOES** 1-5, in their individual capacities,

DEC 5 2025 PM1:59
FILED - USDC - FLMD - TPA

           **Defendants**

## COMPLAINT

### (Wire Fraud - 18 U.S.C. § 1343 and RICO - 18 U.S.C. § 1962)

### I. JURY DEMAND

Plaintiffs DiWann Mathis and Marketa Mathis, individually and as parents and natural

guardians of their minor children, D.M. and D.M., hereby demand a trial by jury on all issues so

triable as a matter of right under the Seventh Amendment to the United States Constitution and

Federal Rule of Civil Procedure 38.

1



## II. NATURE OF THE ACTION

1.      This action arises from a systematic conspiracy orchestrated by Defendants to falsify educational records and transmit those false records across state lines to conceal violations of federal law protecting homeless students.

2.      When Plaintiffs' family experienced homelessness in early 2025, they requested that their children's school—operated by Defendant Freire Schools—provide temporary remote educational services as required by the McKinney-Vento Homeless Assistance Act. Defendants categorically refused.

3.      Faced with the consequences of their refusal—including litigation threats, massive unexcused absences, failing grades, and reputational harm—Defendants orchestrated an elaborate cover-up scheme from their network headquarters in Philadelphia, Pennsylvania.

4.      The conspiracy involved:

   a. Falsifying attendance records by changing hundreds of "Absence Unexcused" entries to "Outside Agency" despite no outside agency placement existing;

   b. Falsifying grade records by converting actual failing grades (documented in emails as "failing 6 course(s) with a grade below 75") to meaningless "P" (Pass) marks that cannot be used to calculate GPA;

   c. Generating multiple versions of transcripts on the same day to eliminate evidence of falsification;

d. Transmitting the false records via interstate wires to Armwood High School in Hillsborough County, Florida;

e. Continuing to defend the false records even after their inadequacy caused enrollment problems and threats of adult school placement for Plaintiffs' son.

5.    The conspiracy was orchestrated at the highest levels of Freire Schools' network headquarters. Defendant Kelly C. Davenport, the CEO and Founder, personally directed the scheme—using her personal Gmail account to evade oversight and instructing Plaintiffs not to contact Freire's attorney. Defendant Leigh Botwinik, the Managing Director, personally executed the scheme by reviewing students' work, assigning false grades, and coordinating the transmission of false records to Florida. Defendant Olivia Burgess facilitated the conspiracy by coordinating the meeting at which it was launched. Defendant Jawanda Murray completed the interstate wire fraud by transmitting the false records to Florida on August 21, 2025—four weeks after they were generated, providing ample time to discover and correct the falsifications but choosing instead to knowingly transmit false records across state lines.

6.    Defendants' conduct violates federal criminal statutes prohibiting wire fraud (18 U.S.C. § 1343) and RICO (18 U.S.C. § 1962), federal civil rights laws protecting educational records (20 U.S.C. § 1232g - FERPA), and Florida state laws prohibiting fraud, conspiracy, and intentional infliction of emotional distress.

7.    As a direct result of Defendants' conspiracy, Plaintiffs' son cannot properly enroll at his new high school in Florida, faces threats of placement in adult education, has lost scholarship opportunities, and suffers ongoing educational and emotional harm.

3

8.    Plaintiffs bring this action to recover compensatory damages, treble damages under RICO, punitive damages against the individual defendants for their intentional and malicious conduct, attorney's fees, and such other relief as the Court deems just.

### III. PROCEDURAL HISTORY AND RELATED LITIGATION

9.    This action arises from a multi-state conspiracy to falsify educational records and transmit those false records across state lines to conceal violations of federal law protecting homeless students. The fraud scheme alleged herein was orchestrated from Defendants' network headquarters in Philadelphia, Pennsylvania and directed at Florida, where Plaintiffs now reside.

**THE DELAWARE CASE - VOLUNTARY DISMISSAL**

10.    On or about July 1, 2025, Plaintiffs filed an action in the United States District Court for the District of Delaware, Case No. 1:25-cv-00805-CFC, captioned; Mathis et al v. Freire Charter School Wilmington. That action named only Freire Charter School Wilmington (the local Delaware school entity) as defendant and sought emergency relief for the denial of McKinney-Vento services.

11.    Plaintiffs are voluntarily dismissing the Delaware action pursuant to Federal Rule of Civil Procedure 41(a). The Delaware case named the wrong defendant—the local school entity rather than the network headquarters and the network-level individuals who orchestrated the fraud conspiracy alleged in this action. Additionally, Delaware is not the proper venue for claims arising from the interstate transmission of false records to Florida.

4

**THE PENNSYLVANIA CASE - UNDERLYING VIOLATIONS**

12.     Plaintiffs have filed a companion action in the United States District Court for the Eastern

District of Pennsylvania, Case No. 2:25-cv-06789-GAM, captioned MATHIS et al v. FREIRE

SCHOOLS et al. The Pennsylvania action addresses the underlying McKinney-Vento violations,

IDEA violations, and constitutional violations that occurred from March through May 2025 at

the Delaware campus.

13.     The Pennsylvania action names as defendants: (a) the network entity (Freire Schools),

headquartered in Philadelphia; and (b) the network CEO/Founder (Kelly C. Davenport) who

ratified the violations from Philadelphia. The school-level staff in Delaware (Durant, Hedgepeth,

Quimpo) who committed the underlying violations are identified as unnamed co-conspirators

and potential witnesses.

14.     The Pennsylvania case is the proper venue for these underlying violations because: (a)

the network policymaker (Freire Schools) is headquartered in Pennsylvania; (b) the network

CEO/Founder (Davenport) who ratified the violations operates from Pennsylvania; (c) Davenport

received the April 3, 2025 Pre-Litigation Demand Notice in Pennsylvania; and (d) the policies

causing the violations were established at Pennsylvania headquarters.

**THIS FLORIDA CASE - FRAUD CONSPIRACY**

15.     This action in the Middle District of Florida addresses a separate but related conspiracy

that occurred AFTER the underlying McKinney-Vento violations and involved DIFFERENT

DEFENDANTS than the Pennsylvania case.

16.    After the March-May 2025 violations were committed by school-level staff (Durant, Hedgepeth, Quimpo), and after Plaintiffs threatened litigation, Defendant Kelly C. Davenport—CEO and Founder based at network headquarters in Philadelphia—orchestrated a fraud scheme from May through August 2025 to cover up the violations.

17.    This fraud conspiracy involved NETWORK-LEVEL actors based in Philadelphia, not the school-level staff in Delaware:

a. KELLY C. DAVENPORT (CEO/Founder, Philadelphia): Orchestrated the conspiracy using personal Gmail (kdaven1048@gmail.com) to evade oversight, instructed Plaintiffs not to contact Freire's attorney, coordinated with network headquarters staff;

b. LEIGH BOTWINIK (Managing Director, Philadelphia): Executed the fraud by personally reviewing students' work, assigning false "P" grades on June 9, 2025, coordinating generation of false transcript versions on July 24, 2025, and filing a false declaration under penalty of perjury in the Delaware case;

c. OLIVIA BURGESS (Executive Assistant, Philadelphia): Facilitated the conspiracy by coordinating the May 14, 2025 Zoom meeting at which Davenport launched the scheme;

d. JAWANDA MURRAY (Records Coordinator): Completed the interstate wire fraud by transmitting the false records to Armwood High School in Florida on August 21, 2025—four weeks after the records were generated, providing ample time to discover and correct falsifications but choosing instead to knowingly transmit false records across state lines.

18.    The school-level staff who committed the underlying violations (Durant, Hedgepeth,

Quimpo) were NOT involved in the May-August 2025 fraud conspiracy. They are identified as unnamed co-conspirators in the Pennsylvania case for the March-May violations, but they are WITNESSES (not defendants) in this Florida case.

**WHY DIFFERENT DEFENDANTS IN DIFFERENT CASES**

19.    The two cases involve different conduct by different actors during different time periods:

**PENNSYLVANIA CASE (E.D. Pa., Case No. 2:25-cv-06789-GAM):**

TIME PERIOD: March - May 2025

CONDUCT: Categorical refusal of McKinney-Vento services, denial of IDEA services, threatening communications

DEFENDANTS: Freire Schools (entity), Kelly C. Davenport (network CEO)

UNNAMED CO-CONSPIRATORS/WITNESSES: Nate Durant (school Head), Mindi Hedgepeth (school staff), Audrey Quimpo (school staff)

FOCUS: Underlying violations of federal education laws

VENUE: Pennsylvania (network HQ, policies established there, Davenport received notice there)

**FLORIDA CASE (M.D. Fla. - instant case):**

TIME PERIOD: May - August 2025 (and ongoing)

CONDUCT: Conspiracy to falsify educational records, interstate wire fraud, RICO

violations, transmission of false records to Florida

DEFENDANTS: Freire Schools (entity), Kelly C. Davenport (orchestrator), Leigh Botwinik (executor), Olivia Burgess (facilitator), Jawanda Murray (transmitter), Does 1-10:

FOCUS: Fraud conspiracy and cover-up orchestrated from Philadelphia and targeting Florida Plaintiffs, and Hillsborough County Public Schools

VENUE: Florida (false records transmitted TO Florida, harm occurring IN Florida, Plaintiffs are Florida residents)

20.    Durant, Hedgepeth, and Quimpo committed the March-May 2025 violations in Delaware and are identified as unnamed co-conspirators in the Pennsylvania case. They were not involved in the network-level conspiracy orchestrated from Philadelphia headquarters to falsify and transmit records to Florida. That conspiracy involved Davenport, Botwinik, Burgess, and Murray —all network headquarters personnel. Durant, Hedgepeth, and Quimpo are witnesses in this Florida case.


**RELATIONSHIP BETWEEN THE TWO CASES**

21.    While the Pennsylvania case and this Florida case involve overlapping facts and some overlapping defendants (Freire Schools and Davenport), each case addresses distinct conduct with independent bases for liability:

a. The Pennsylvania case addresses the categorical refusal itself—the "what" that was refused;

8

b. This Florida case addresses the cover-up of that refusal—the "how" Defendants tried to hide it through interstate fraud.

22.     The cases are complementary, not duplicative:

a. Pennsylvania addresses policy-level violations (refusing services to homeless students with disabilities);

b. Florida addresses the criminal conspiracy to cover up those violations (falsifying and transmitting records to hide the refusal's consequences).

23.     Both actions arise from Defendants' coordinated scheme to deny federally-protected rights to Plaintiffs' family, but each action has independent jurisdictional bases and addresses different aspects of Defendants' misconduct.

## IV. JURISDICTION AND VENUE

### A. SUBJECT MATTER JURISDICTION

24.     This Court has original jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). Plaintiffs assert violations of federal criminal statutes enforceable through private civil actions, including:

a. Wire Fraud, 18 U.S.C. § 1343 (interstate transmission of false records to defraud Florida school and Florida family);

b. Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1962(c) and 1962(d) (pattern of racketeering activity including wire fraud and mail fraud);

c. RICO Civil Remedies, 18 U.S.C. § 1964(c) (treble damages for injury to business or property by reason of RICO violations).

25.    This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as Plaintiffs' federal claims.

**B. PERSONAL JURISDICTION**

26.    This Court has personal jurisdiction over all Defendants because they purposefully directed their fraudulent scheme at Florida, caused harm in Florida, and had sufficient minimum contacts with Florida to satisfy due process.

27.    This was not a case of defendants engaging in conduct that coincidentally affected someone who happened to move to Florida. Rather, Defendants KNEW the false records would be transmitted to a Florida school. Defendants KNEW Plaintiffs were Florida residents. Defendants KNEW the harm would occur in Florida. Despite this knowledge, Defendants CHOSE to complete their fraud scheme by transmitting false records TO FLORIDA.

28.    On August 21, 2025, Defendant Jawanda Murray transmitted false educational records from Delaware across state lines to Armwood High School, 12000 US Highway 92 East, Seffner, Florida 33584, located in Hillsborough County within this judicial district. This interstate

10

transmission was the final act completing the wire fraud and was purposefully directed at a Florida institution.

29.    Defendants knew or should have known that transmitting false educational records to a Florida high school would:

a. Cause the Florida school to rely on false information in making enrollment and placement decisions;

b. Harm Florida students and Florida families who are entitled to accurate educational records;

c. Undermine the integrity of Florida's educational system;

d. Expose the Florida school to liability for improper enrollment decisions based on false information;

e. Violate Florida's substantial interest in ensuring that students attending Florida schools have accurate educational records.

30.    By deliberately choosing to complete their fraud through transmission to a Florida school, Defendants "reached out" to Florida and invoked the benefits and protections of Florida law. They cannot now claim that Florida courts lack jurisdiction over them.

31.    Armwood High School—a Florida public school serving Florida students in Hillsborough County—was used as an unwitting tool in Defendants' fraud scheme. Defendants transmitted false records to Armwood, knowing that Armwood would rely on those records in good faith,

knowing that Armwood had no reason to suspect the records were false, and knowing that Armwood would be harmed when the fraud was discovered.

32.    Florida has a substantial interest in protecting its schools from being used as instruments of fraud by out-of-state actors. When Pennsylvania defendants deliberately transmit false records to a Florida school, thereby undermining that school's ability to make informed decisions and exposing that school to potential liability, those defendants subject themselves to the jurisdiction of Florida courts.

33.    DEFENDANTS' CONTACTS WITH FLORIDA WERE NOT ISOLATED. The August 21, 2025 transmission was not a single isolated contact but part of a sustained scheme:

a. May 14, 2025: Defendant Davenport conducted Zoom meeting with Plaintiffs (Florida residents) launching the scheme;

b. May-August 2025: Ongoing communications between Defendants and Florida residents (Plaintiffs) about the "independent study" arrangement;

c. July 24, 2025: Defendant Botwinik generated false transcript versions knowing they would be sent to Florida;

d. August 15, 2025: Phone call between Defendant Botwinik and Armwood High School in Florida;

e. August 21, 2025: Transmission of false records to Florida school;

f. Post-August 21, 2025: Defendants' ongoing refusal to correct false records despite

knowledge of harm in Florida.

34.     These purposeful contacts with Florida over a four-month period establish personal jurisdiction under the "purposeful availment" prong of the minimum contacts test.

## C. VENUE PROPER IN THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION

35.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2), which provides that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

36.     A SUBSTANTIAL PART—INDEED, THE MOST SUBSTANTIAL PART—OF THE EVENTS GIVING RISE TO PLAINTIFFS' CLAIMS OCCURRED IN THIS DISTRICT:

> a. The wire fraud was COMPLETED in this district when false records crossed state lines and arrived at Armwood High School in Seffner, Florida (Hillsborough County, within Tampa Division) on August 21, 2025;

> b. The harm from the fraud is OCCURRING in this district—Plaintiffs' son cannot properly enroll at Armwood High School (Hillsborough County), faces threats of adult school placement in Florida, has lost Florida scholarship eligibility;

> c. Plaintiffs RESIDE in this district (Seffner, Hillsborough County) and are suffering continuing harm here;

> d. The victim of the fraud—Armwood High School—is located in this district and was

13

misled into enrolling a student under false pretenses;

e. The discovery of the fraud and resulting enrollment crisis occurred in this district.

37.     FLORIDA LAW RECOGNIZES VENUE WHERE FRAUD IS COMPLETED, NOT MERELY WHERE IT ORIGINATES. Under the "substantial part" test, courts look to where the harmful effects of the fraud were felt. Here, while the conspiracy was planned in Pennsylvania, the fraud was not complete until the false records were transmitted to and received by a Florida school. The receipt of false records by Armwood High School in this district is the event that gave rise to Plaintiffs' claims for wire fraud and RICO violations.

38.     VENUE IN THIS DISTRICT SERVES JUSTICE. The victims (Plaintiffs and Armwood High School) are in this district. The harm is occurring in this district. The evidence of harm (enrollment problems, threats from Florida school officials, lost Florida scholarship opportunities) is in this district. The most convenient forum for witnesses and evidence is this district. Justice requires that Defendants who deliberately targeted Florida answer for their fraud in the Florida district where their victims are located and their harm is occurring.

39.     DEFENDANTS CANNOT COMMIT FRAUD TARGETING FLORIDA AND THEN CLAIM FLORIDA IS INCONVENIENT. Defendants made a calculated decision to complete their fraud by transmitting false records to a Florida school. They chose Florida as the target of their scheme. Having made that choice, they cannot now claim that Florida is an improper or inconvenient venue.

**D. THIS DISTRICT HAS A COMPELLING INTEREST IN THIS LITIGATION**

14

40.    Beyond the technical requirements of jurisdiction and venue, this Court should exercise its jurisdiction because Florida—and this district specifically—has compelling interests that are directly implicated by Defendants' conduct:

a. Armwood High School was used as an unwitting instrument of fraud. Florida has a strong interest in deterring out-of-state actors from transmitting false records to Florida schools, thereby protecting the integrity of Florida's educational system.

b. Plaintiffs are Florida residents whose son attends a Florida school and whose educational future is being determined by Florida institutions. Florida has a compelling interest in protecting its residents from interstate fraud affecting their children's education.

c. D.M. lost eligibility for Florida's Bright Futures scholarship program due to false grades appearing on records sent to his Florida school. Florida has invested substantial public funds in the Bright Futures program to help Florida students attend Florida colleges. Florida has a strong interest in ensuring that Florida students are not denied Florida scholarships due to out-of-state fraud.

d. If Pennsylvania defendants can transmit false records to Florida schools with impunity, Florida's educational system becomes vulnerable to manipulation by out-of-state actors. Florida has a compelling interest in deterring such conduct by providing a forum for victims to seek redress.

41.    For all of these reasons, this Court has jurisdiction over this action, venue is proper in this

district, and Florida's interests strongly favor exercise of that jurisdiction.

## V. PARTIES

### A. PLAINTIFFS

42.     Plaintiff DiWann Mathis is an individual residing in Seffner, Florida, within Hillsborough County and the Tampa Division of the Middle District of Florida. He is the father of minor children D.M. and D.M. and brings this action individually and as next friend and natural guardian of his minor children.

43.     Plaintiff Marketa Mathis is an individual residing in Seffner, Florida, within Hillsborough County and the Tampa Division of the Middle District of Florida. She is the mother of minor children D.M. and D.M. and brings this action individually and as next friend and natural guardian of her minor children.

44.     Plaintiff D.M. (the older) is a minor child residing in Seffner, Florida. He brings this action through his parents and next friends. He is the primary victim of Defendants' fraud—the false educational records were created in his name and transmitted to Armwood High School in Hillsborough County, Florida.

45.     Plaintiff D.M. (the younger) is a minor child residing in Seffner, Florida. She brings this action through her parents and next friends.

### B. DEFENDANTS

46.    Defendant FREIRE SCHOOLS is a Pennsylvania nonprofit corporation with its principal place of business at 1617 John F. Kennedy Boulevard, Suite 580, Philadelphia, Pennsylvania 19103. Freire Schools operates a network of charter schools and is the enterprise within the meaning of 18 U.S.C. § 1961(4).

47.    Defendant KELLY C. DAVENPORT is sued in her individual capacity only. At all relevant times, Davenport was Chief Executive Officer (CEO) and Founder of Freire Schools, operating from the network headquarters in Philadelphia, Pennsylvania. Davenport orchestrated the fraud conspiracy using her personal Gmail account (kdaven1048@gmail.com) to evade oversight.

48.    Defendant LEIGH BOTWINIK is sued in her individual capacity only. At all relevant times, Botwinik was Managing Director of Freire Schools, operating from the network headquarters in Philadelphia, Pennsylvania. Botwinik executed the fraud by personally assigning false grades, coordinating generation of false transcripts, and filing a false declaration under penalty of perjury.

49.    Defendant OLIVIA BURGESS is sued in her individual capacity only. At all relevant times, Burgess was Executive Assistant at Freire Schools, operating from the network headquarters in Philadelphia, Pennsylvania. Burgess facilitated the conspiracy by coordinating the May 14, 2025 Zoom meeting and supporting Davenport's use of personal email to evade oversight.

50.    Defendant JAWANDA MURRAY is sued in her individual capacity only. At all relevant times, Murray was employed by or associated with Freire Schools in a records-related position

17

(Registrar, Records Coordinator, or similar). Murray committed the interstate wire fraud by transmitting false records from Pennsylvania or Delaware to Armwood High School in Florida on August 21, 2025.

51.     Defendants JOHN DOES 1-5 and JANE DOES 1-5 are sued in their individual capacities only. These are unknown individuals employed by or associated with Freire Schools who participated in, facilitated, or furthered the conspiracy. Plaintiffs will seek leave to amend to substitute true names once discovered through discovery.

## VI. FACTUAL BACKGROUND

### A. THE UNDERLYING VIOLATIONS (MARCH-MAY 2025)

52.     In March 2025, Plaintiffs' family was experiencing homelessness and relocating from Delaware to Florida. Plaintiffs' two minor children, D.M. (the older) and D.M. (the younger), were enrolled at Freire Charter School Wilmington in Delaware.

53.     During the 2024-2025 school year at Freire Charter School Wilmington, D.M. (the older) was enrolled in 10th grade and D.M. (the younger) was enrolled in 8th grade.

54.     Upon relocating to Florida, D.M. (the older) was to enroll in 11th grade and D.M. (the younger) was to enroll in 9th grade at Armwood High School for the 2025-2026 school year.

55.     On March 17, 2025, Freire Charter School Wilmington categorically refused to provide remote educational services to Plaintiffs' children as required by the McKinney-Vento Homeless

Assistance Act.

56.     From March through May 2025, school staff Mindi Hedgepeth and Audrey Quimpo sent emails to Plaintiffs regarding truancy charges, grade retention, and unexcused absences.

57.     These March-May 2025 events are the subject of Plaintiffs' companion action in the Eastern District of Pennsylvania, Case No. 2:25-cv-06789-GAM.

## B. APRIL 3, 2025: NOTICE TO NETWORK HEADQUARTERS

58.     On April 3, 2025, Plaintiffs sent a Pre-Litigation Demand Notice to Kelly C. Davenport at Freire Schools' network headquarters in Philadelphia, Pennsylvania.

59.     The notice provided legal analysis citing federal statutes and case law regarding the McKinney-Vento Homeless Assistance Act and the Individuals with Disabilities Education Act.

60.     The notice demanded corrective action by April 17, 2025.

61.     The notice stated that litigation would be filed by May 1, 2025 if the matter was not resolved.

62.     Davenport did not respond to the April 3, 2025 notice by the April 17, 2025 deadline or the May 1, 2025 deadline.

## C. MAY 8-9, 2025: DAVENPORT'S FIRST CONTACT

63.     On May 8, 2025, Davenport contacted Plaintiffs using a personal Gmail account

(kdaven1048@gmail.com) rather than her official Freire Schools network email address.

64.    On May 9, 2025, Plaintiffs responded to Davenport and copied Attorney Jennifer Becnel-Guzzo of Saul Ewing LLP, who had represented Freire Schools in prior correspondence.

65.    On May 9, 2025, Davenport sent an email from her personal Gmail account stating: "As I will be speaking with you, please do not involve any attorney from Freire's end any further unless otherwise notified."

66.    Davenport copied Olivia Burgess on this email.

**D. MAY 14, 2025: ZOOM MEETING**

67.    On May 9, 2025 at 4:31 PM, Olivia Burgess sent Plaintiffs a calendar invitation for a Zoom meeting scheduled for May 14, 2025.

68.    On May 14, 2025, Davenport conducted a Zoom meeting with Plaintiffs.

69.    During the May 14, 2025 meeting, Davenport proposed that D.M. (the older) complete "independent study" work.

70.    On May 15, 2025, Davenport sent a follow-up email from her personal Gmail account regarding the independent study arrangement.

**E. HEDGEPETH'S CONTEMPORANEOUS GRADE RECORDS (DECEMBER 2024 - MAY 2025)**

**D.M. (the older)**

71.     On December 6, 2024, Mindi Hedgepeth—the school staff member responsible for maintaining student grades at Freire Charter School Wilmington—sent an email to Plaintiffs stating: "I am sending this email to inform you that as of December 6th, [D.M.] is failing 4 course(s) with a grade below 75 for Quarter 2."

72.     On March 19, 2025, Hedgepeth sent an email to Plaintiffs stating: "I am sending this email to inform you that as of 2/24, [D.M.] is failing 6 course(s) with a grade below 75 for Quarter 3."

73.     On May 16, 2025, Hedgepeth sent an email to Plaintiffs stating: "I am sending this email to inform you that as of 5/16, [D.M.] is failing 6 course(s) with a grade below 75 for Quarter 4."

74.     As of May 16, 2025—two months after services were refused on March 17, 2025—D.M. (the older) was failing six (6) courses with grades below 75.

**D.M. (the younger)**

75.     On December 6, 2024, Hedgepeth sent an email to Plaintiffs stating: "I am sending this email to inform you that as of December 6th, [D.M.] is failing 4 course(s) with a grade below 75 for Quarter 2."

76.     On January 15, 2025, Hedgepeth sent an email to Plaintiffs stating: "I am sending this email to inform you that as of today, [D.M.] is NOT passing 4 course(s) with a grade below 75 for Quarter 2."

77.    On February 24, 2025, Hedgepeth sent an email to Plaintiffs stating: "I am sending this email to inform you that as of 2/24, [D.M.] is failing 1 course(s) with a grade below 75 for Quarter 3."

78.    On March 19, 2025, Hedgepeth sent an email to Plaintiffs stating: "I am sending this email to inform you that as of 2/24, [D.M.] is failing 3 course(s) with a grade below 75 for Quarter 3."

79.    On April 16, 2025, Hedgepeth sent an email to Plaintiffs stating: "I am sending this email to inform you that as of 4/15, [D.M.] is failing 4 course(s) with a grade below 75 for Quarter 4."

80.    As of April 16, 2025—one month after services were refused on March 17, 2025—D.M. (the younger) was failing four (4) courses with grades below 75.

**Significance of Hedgepeth's Grade Records**

81.    Hedgepeth's emails were sent contemporaneously throughout the 2024-2025 school year, from December 2024 through May 2025.

82.    Hedgepeth's emails were routine grade notifications sent to parents of struggling students —not litigation-related communications.

83.    Hedgepeth's emails prove that Freire Charter School Wilmington used numeric grading throughout the 2024-2025 school year, with 75 as the passing threshold.

84.    Hedgepeth's emails prove that both children were failing multiple courses with grades below 75 as late as April and May 2025.

85.    Hedgepeth was not involved in the network-level fraud conspiracy orchestrated by Davenport and Botwinik from Philadelphia headquarters.

86.    Hedgepeth continued to maintain accurate grade records at the school level, unaware that network headquarters was planning to falsify those records.

87.    The discrepancy between Hedgepeth's authentic grade records and Botwinik's falsified transcripts proves that Defendants knowingly and intentionally converted failing grades to passing grades.

**F. JUNE 9, 2025: BOTWINIK'S GRADE FALSIFICATION**

88.    On June 9, 2025, Leigh Botwinik—Managing Director at Freire Schools' Philadelphia headquarters—reviewed work submitted by D.M. (the older).

89.    On June 9, 2025, Botwinik assigned "P" (Pass) grades for D.M. (the older) in the following courses: English 10, Algebra II, Chemistry, World History, Spanish II, and Physical Education.

90.    At the time Botwinik assigned these "P" grades, Hedgepeth's records showed D.M. (the older) was failing six (6) courses with grades below 75.

91.    Botwinik did not coordinate with Hedgepeth before assigning the "P" grades.

92.    Botwinik did not update the student information system maintained by campus staff.

93.    Botwinik created parallel records outside of the normal grading system to avoid

detection.

94.     Botwinik's bypass of campus staff was deliberate—she knew that Hedgepeth and other campus personnel would object to assigning passing grades to students who were documented as failing six courses.

### The Mathematical Impossibility

95.     Services were refused on March 17, 2025.

96.     As of May 16, 2025, D.M. (the older) was failing six (6) courses per Hedgepeth's contemporaneous email.

97.     Botwinik assigned passing grades on June 9, 2025.

98.     D.M. (the older) could not attend school after March 17, 2025 due to the McKinney-Vento violation.

99.     It is mathematically impossible for a student to go from failing six courses on May 16, 2025 to passing all courses on June 9, 2025—a period of 24 days—without attending school.

100.    The "independent study" work purportedly reviewed by Botwinik could not have legitimately converted six failing grades to passing grades in the absence of classroom instruction, testing, or teacher oversight.

101.    Botwinik knew the grades she assigned were false because she had access to the student information system showing the authentic failing grades.

**Consciousness of Guilt**

102.    If the "P" grades were legitimate, Botwinik would have coordinated with Hedgepeth (who maintained the authentic gradebook).

103.    If the "P" grades were legitimate, Botwinik would have updated the official student information system.

104.    If the "P" grades were legitimate, Botwinik would have involved the Head of School (Durant) to certify that the students completed the required coursework.

105.    Instead, Botwinik deliberately excluded all campus staff who would have known the grades were false and created secret parallel records at the network level.

106.    This deliberate bypass of those with knowledge of the true facts proves that Botwinik knew she was creating false records.


## G. JULY 24, 2025: THE MULTIPLE TRANSCRIPT VERSIONS

107.    On July 24, 2025, Freire Schools generated official transcripts for D.M. (the older).

108.    On that single day, multiple versions of the transcript were generated with different content.

109.    The generation of multiple transcript versions on a single day is indicative of an attempt to create a version that would conceal the fraud.

110.    Normal transcript generation does not require multiple versions on the same day.

111.    The multiple versions demonstrate that Defendants were aware of problems with the transcripts and were attempting to manipulate the records.

112.    Despite generating multiple versions, Defendants failed to correct the fundamental falsification—the conversion of failing numeric grades to meaningless "P" grades.

113.    The final version transmitted to Florida contained the same false "P" grades that Botwinik had assigned on June 9, 2025.

## H. THE GRADE REPORT VS. THE TRANSCRIPT

114.    At some point, Plaintiffs obtained a "Grade Report" for D.M. (the older) from Freire Schools.

115.    The Grade Report showed numeric grades for multiple courses, confirming that the school used numeric grading.

116.    The Grade Report contradicted Botwinik's later claim that the school used a "pass/fail grading system."

117.    The existence of the Grade Report with numeric grades proves that Defendants' claim of a "pass/fail system" was false.

118.    The Grade Report is direct documentary evidence that Defendants knew the "P" grades on the transcript were fabrications.

## I. PLAINTIFFS RECEIVE AND FURNISH THE TRANSCRIPTS

119.    In or around July 2025, Botwinik sent transcripts to Plaintiffs via email.

120.    The transcripts showed "P" grades for D.M. (the older) in multiple courses.

121.    Plaintiffs, trusting that Freire Schools had provided accurate records, furnished the transcripts to Armwood High School for enrollment purposes.

122.    Plaintiffs had no reason to believe the transcripts were false.

123.    Plaintiffs relied on Defendants' representations that the transcripts were accurate educational records.

124.    Plaintiffs' reliance was reasonable and foreseeable to Defendants.

## J. ARMWOOD'S DISCOVERY OF DISCREPANCIES

125.    Upon reviewing the transcripts, Armwood High School officials discovered discrepancies.

126.    Armwood officials noted that "P" grades could not be used to calculate a GPA.

127.    Armwood officials noted that the transcripts were inadequate for proper enrollment and placement decisions.

128.    Armwood officials confronted Plaintiffs about the discrepancies, implying that Plaintiffs may have altered the records.

129.    This confrontation caused Plaintiffs significant embarrassment, humiliation, and emotional distress.

130.    Armwood officials threatened to place D.M. (the older) in adult education due to the inadequate records.

131.    The threat of adult education placement caused Plaintiffs and D.M. (the older) significant anxiety and distress.

132.    Armwood's discovery of discrepancies triggered additional communications between Armwood and Freire Schools.

**K. AUGUST 15, 2025: BOTWINIK'S FALSE STATEMENT TO ARMWOOD**

133.    On or about August 15, 2025, Armwood High School contacted Freire Schools to clarify the transcript discrepancies.

134.    Armwood specifically inquired about the "P" grades and the lack of numeric grades for GPA calculation.

135.    Armwood needed clarification to make proper enrollment and placement decisions for D.M. (the older).

136.    Defendant Leigh Botwinik responded to Armwood's inquiry.

137.    During a phone call on or about August 15, 2025, Botwinik told Armwood High School that Freire Charter School Wilmington used a "pass/fail grading system" for the 2024-2025

school year.

138.    This statement was false.

139.    Botwinik knew the statement was false when she made it.

**Evidence Proving Botwinik's Statement Was False**

140.    Hedgepeth's contemporaneous emails from December 2024 through May 2025 all referenced numeric grades with a 75-point passing threshold.

141.    If the school used "pass/fail," Hedgepeth's emails would not have referenced "grades below 75."

142.    The Grade Report obtained by Plaintiffs showed numeric grades, not "P/F" designations.

143.    The school's student information system maintained by Hedgepeth used numeric grading.

144.    No documentation exists showing that Freire Charter School Wilmington adopted a "pass/fail grading system" for 2024-2025.

145.    The "P" grades were assigned only by Botwinik on June 9, 2025—after the grading period ended and after Plaintiffs threatened litigation.

146.    If the school genuinely used pass/fail grading, Hedgepeth (the school-level staff member maintaining grades) would have used it throughout the year—not just Botwinik at the network level after litigation was threatened.

147.    The timing of the "P" grades—assigned only after Plaintiffs threatened litigation—proves

they were fabricated to cover up the McKinney-Vento violations.

148.    Botwinik's false statement to Armwood was part of the continuing cover-up conspiracy.

**Purpose of Botwinik's False Statement**

149.    By telling Armwood that the school used "pass/fail," Botwinik attempted to legitimize the false "P" grades.

150.    Botwinik's false statement was designed to prevent Armwood from discovering that the transcripts had been falsified.

151.    Botwinik's false statement was designed to shift blame away from Freire Schools and onto Plaintiffs.

152.    Botwinik's false statement was designed to induce Armwood to accept the deficient transcripts without further inquiry.

153.    Botwinik's false statement constitutes wire fraud under 18 U.S.C. § 1343, as it was transmitted via interstate telephone.

**L. THE TWENTY-EIGHT DAY PERIOD: JULY 24 TO AUGUST 21, 2025**

154.    The false transcripts were generated on July 24, 2025.

155.    The false transcripts were not transmitted to Armwood until August 21, 2025.

156.    This twenty-eight (28) day period provided ample opportunity for Defendants to review,

verify, and correct the transcripts before transmission.

### Murray's Interstate Transmission

157.    On August 21, 2025, Defendant Jawanda Murray transmitted the false educational records from Pennsylvania or Delaware to Armwood High School in Seffner, Florida.

158.    Murray transmitted the records via interstate electronic communication (email or electronic records transfer).

159.    Murray's transmission completed the interstate wire fraud.

160.    Murray knew or should have known that she was transmitting records across state lines to a Florida school.

### The Transmitted Records Confirmed the Fraud

161.    The records transmitted by Murray on August 21, 2025 contained the same false "P" grades that Botwinik had assigned on June 9, 2025.

162.    The records transmitted by Murray matched the transcripts that Plaintiffs had previously furnished to Armwood.

163.    The transmission of matching false records confirmed that the falsifications originated from Freire Schools, not from any alteration by Plaintiffs.

164.    The transmission of matching false records eliminated any remaining doubt about the source of the fraud.

**Opportunities to Correct During the Twenty-Eight Days**

165.    During the twenty-eight day period, Defendants had multiple opportunities to discover and correct the falsifications.

166.    Defendants could have compared Botwinik's "P" grades against Hedgepeth's authentic numeric grades.

167.    Defendants could have consulted with Hedgepeth or Durant about the accuracy of the transcripts.

168.    Defendants could have reviewed the student information system to verify the grades.

169.    Defendants could have acknowledged the McKinney-Vento violations and provided accurate records showing the failing grades.

170.    Instead, Defendants chose to transmit records they knew were false.

171.    The twenty-eight day delay proves that the transmission was deliberate and knowing, not inadvertent.

**M. CONSEQUENCES OF DEFENDANTS' FRAUD**

172.    As a direct result of Defendants' fraud conspiracy, Plaintiffs and their children have suffered and continue to suffer harm.

173.    D.M. (the older) cannot properly enroll at Armwood High School due to the inadequate transcripts.

174.    D.M. (the older) faces uncertainty about his grade placement and academic standing.

175.    D.M. (the older) has been threatened with placement in adult education rather than traditional high school.

176.    D.M. (the older) has lost eligibility for Florida's Bright Futures scholarship program due to the inability to calculate an accurate GPA.

177.    The loss of Bright Futures eligibility represents a significant financial harm, as the scholarship would have covered substantial college tuition costs.

178.    Plaintiffs have suffered emotional distress, anxiety, and humiliation as a result of being confronted by Armwood officials and accused of altering records.


## VII. COUNTS


### COUNT I


### WIRE FRAUD (18 U.S.C. § 1343)


(Against All Defendants)

179.    Plaintiffs incorporate by reference the allegations contained in paragraphs 46-51 (identifying Defendants), 88-106 (Botwinik's grade falsification), 107-113 (transcript generation), 137-153 (Botwinik's false "pass/fail" statement), and 156-171 (Murray's interstate transmission and the twenty-eight day period).

180.    Title 18, United States Code, Section 1343 prohibits the use of interstate wire communications to execute a scheme to defraud.

**Scheme to Defraud**

181.    From May 2025 through August 2025, Defendants devised and executed a scheme to defraud Armwood High School and Plaintiffs by falsifying educational records and transmitting those false records across state lines.

182.    The scheme involved the following false pretenses:

a. The "P" grades assigned by Botwinik on June 9, 2025 reflected actual academic achievement, when in fact Hedgepeth's contemporaneous emails showed the children were failing six and four courses respectively with grades below 75 (¶¶ 71-80, 88-101);

b. The school used a "pass/fail grading system" for 2024-2025, when in fact Hedgepeth's emails and the Grade Report prove the school used numeric grading with a 75-point threshold (¶¶ 81-87, 114-118, 140-144);

c. The transcripts transmitted to Armwood were accurate educational records suitable for enrollment decisions (¶¶ 107-113, 161-164).

**Use of Interstate Wire Communications**

183.    On August 21, 2025, Defendant Murray transmitted false educational records from Pennsylvania or Delaware to Armwood High School in Seffner, Florida via interstate electronic communication, as alleged in paragraphs 156-160.

34

184. On August 15, 2025, Defendant Botwinik used interstate telephone to make the false "pass/fail" statement to Armwood High School in Florida, as alleged in paragraphs 137-139. This constitutes additional wire fraud.

### Intent to Defraud

185. Defendants acted with intent to defraud, as demonstrated by:

a. Davenport's use of personal Gmail to evade oversight (¶ 63);

b. Botwinik's deliberate bypass of campus staff who maintained authentic grades (¶¶ 91-94, 102-106);

c. Generation of multiple transcript versions on July 24, 2025 (¶¶ 108-113);

d. Botwinik's false "pass/fail" statement contradicted by documentary evidence (¶¶ 140-148);

e. Twenty-eight day delay with multiple opportunities to correct falsifications (¶¶ 165-171).

### Harm

186. As a direct result of Defendants' wire fraud, Plaintiffs suffered harm including: enrollment problems, threats of adult education placement, loss of Bright Futures scholarship eligibility, damage to reputation when confronted by Armwood staff, and emotional distress, as alleged in paragraphs 125-132 and 172-178.

**PRAYER FOR RELIEF**

187.    **WHEREFORE**, Plaintiffs pray for judgment against all Defendants, jointly and severally, for compensatory damages, punitive damages, costs, and such other relief as the Court deems just.

**COUNT II**

**RICO - 18 U.S.C. § 1962(c)**

(Against All Defendants)

188.    Plaintiffs incorporate by reference the allegations contained in paragraph 46 (identifying Freire Schools as the enterprise), paragraphs 47-51 (identifying individual Defendants), and paragraphs 179-186 above (the wire fraud allegations).

189.    The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), makes it unlawful for any person employed by or associated with an enterprise to conduct or participate in the conduct of such enterprise's affairs through a pattern of racketeering activity.

**Enterprise**

190.    Defendant Freire Schools is an "enterprise" within the meaning of 18 U.S.C. § 1961(4)—a legal entity engaged in activities affecting interstate commerce, as alleged in paragraph 46.

191.    The enterprise operates charter schools in multiple states and transmits educational records across state lines.

**Pattern of Racketeering Activity**

192.    Defendants engaged in a pattern of racketeering activity consisting of multiple predicate

acts of wire fraud (18 U.S.C. § 1343):

> a. June 9, 2025: Botwinik assigned false grades bypassing authentic gradebook (¶¶ 88-
>
> 94);
>
> b. July 24, 2025: Generation of multiple false transcript versions (¶¶ 107-113);
>
> c. July 2025: Botwinik transmitted false transcripts to Plaintiffs via interstate email (¶¶
>
> 119-121);
>
> d. August 15, 2025: Botwinik's false "pass/fail" statement via interstate telephone (¶¶
>
> 137-153);
>
> e. August 21, 2025: Murray's interstate transmission of false records to Florida (¶¶ 156-
>
> 164).

193.    These predicate acts are related—all were part of a single scheme to cover up McKinney-

Vento violations through falsified records.

194.    These predicate acts demonstrate continuity—the scheme lasted from May through

August 2025 and threatens future harm as false records remain on file.

**Injury to Business or Property**

195.    Plaintiffs were injured in their business or property by reason of Defendants' RICO

37

violations, including: loss of Bright Futures scholarship eligibility (¶¶ 176-177), costs incurred to remedy false records, and lost educational opportunities.

**PRAYER FOR RELIEF**

196.     **WHEREFORE,** Plaintiffs pray for judgment against all Defendants, jointly and severally, for treble damages under 18 U.S.C. § 1964(c), costs of suit including reasonable attorney's fees, and such other relief as the Court deems just.

**COUNT III**

**RICO CONSPIRACY - 18 U.S.C. § 1962(d)**

(Against All Defendants)

197.     Plaintiffs incorporate by reference the allegations contained in paragraphs 188-195 above (the RICO § 1962(c) allegations).

198.     18 U.S.C. § 1962(d) makes it unlawful for any person to conspire to violate subsection (c).

199.     Defendants conspired together to conduct the affairs of Freire Schools through a pattern of racketeering activity as described in paragraphs 192-194.

200.     The conspiracy is evidenced by the coordinated actions of each Defendant:

        a. Davenport orchestrated the scheme using personal email and instructing Plaintiffs not

to involve Freire's attorney (¶¶ 63-66);

b. Burgess coordinated the May 14, 2025 Zoom meeting (¶¶ 67-68);

c. Botwinik executed grade falsification and made false statements (¶¶ 88-106, 137-153);

d. Murray transmitted false records at Botwinik's direction (¶¶ 156-160).

## PRAYER FOR RELIEF

201.    **WHEREFORE**, Plaintiffs pray for judgment against all Defendants for treble damages under 18 U.S.C. § 1964(c), costs, and such other relief as the Court deems just.

## COUNT IV

### FRAUD / INTENTIONAL MISREPRESENTATION

#### (Against Defendant Botwinik)

202.    Plaintiffs incorporate by reference the allegations contained in paragraph 48 (identifying Botwinik), paragraphs 88-106 (Botwinik's grade falsification), paragraphs 119-121 (Botwinik emailing transcripts), and paragraphs 137-153 (Botwinik's false "pass/fail" statement).

203.    Under Florida law, fraud requires: (1) a false statement of material fact; (2) knowledge of falsity; (3) intent to induce reliance; (4) justifiable reliance; and (5) resulting damages.

204.    Botwinik made the following false statements of material fact:

a. The "P" grades she assigned on June 9, 2025 were legitimate academic assessments (¶¶

39

88-89);

b. The school used a "pass/fail grading system" for 2024-2025 (¶ 138);

c. The transcripts she sent to Plaintiffs were accurate educational records (¶¶ 119-121).

205.    Botwinik knew these statements were false because Hedgepeth's contemporaneous emails prove the school used numeric grading and both children were failing multiple courses (¶¶ 71-87, 140-148).

206.    Botwinik intended Plaintiffs and Armwood to rely on these false statements to accept the deficient transcripts (¶¶ 149-152).

207.    Plaintiffs and Armwood justifiably relied on Botwinik's false statements by furnishing and accepting the transcripts for enrollment (¶¶ 122-124).

208.    Plaintiffs were damaged as a result of Botwinik's fraud (¶¶ 172-178).

**PRAYER FOR RELIEF**

209.    **WHEREFORE**, Plaintiffs pray for judgment against Defendant Botwinik for compensatory damages, punitive damages, and such other relief as the Court deems just.

**COUNT V**

**NEGLIGENT MISREPRESENTATION**

(Against All Defendants - In the Alternative to Count IV)

40

210.    Plaintiffs incorporate by reference the allegations contained in paragraphs 46-51

(identifying Defendants), paragraphs 119-121 (transcripts sent to Plaintiffs), and paragraphs 156-

164 (records transmitted to Armwood).

211.    In the alternative to Count IV, Defendants made false statements regarding the children's

educational records without exercising reasonable care to determine their truth or falsity.

212.    Defendants had a duty to provide accurate educational records to Plaintiffs and

Armwood.

213.    Defendants breached this duty by transmitting records they knew or should have known

were false, as demonstrated by Hedgepeth's contemporaneous emails (¶¶ 71-87).

214.    Plaintiffs justifiably relied on Defendants' representations by furnishing the transcripts to

Armwood (¶¶ 122-124).

215.    Plaintiffs were damaged as a result (¶¶ 172-178).

**PRAYER FOR RELIEF**

216.    **WHEREFORE**, Plaintiffs pray for judgment against all Defendants for compensatory

damages and such other relief as the Court deems just.

**COUNT VI**

**CIVIL CONSPIRACY**

41

(Against All Defendants)

217.    Plaintiffs incorporate by reference the allegations contained in paragraphs 46-51

(identifying Defendants), paragraphs 63-70 (Davenport's first contact and Zoom meeting),

paragraphs 88-106 (Botwinik's grade falsification), paragraphs 137-153 (Botwinik's false

statement), and paragraphs 156-164 (Murray's transmission).

218.    Under Florida law, civil conspiracy requires: (1) an agreement between two or more

parties; (2) to do an unlawful act; (3) an overt act in furtherance; and (4) resulting damages.

219.    Defendants agreed to falsify educational records and transmit them across state lines to

conceal McKinney-Vento violations.

220.    Overt acts in furtherance of the conspiracy include:

    a. Davenport's May 9, 2025 email instructing Plaintiffs not to contact Freire's attorney (¶

    65);

    b. Burgess coordinating the May 14, 2025 Zoom meeting (¶¶ 67-68);

    c. Botwinik assigning false grades on June 9, 2025 (¶¶ 88-89);

    d. Botwinik's false "pass/fail" statement on August 15, 2025 (¶¶ 137-138);

    e. Murray's transmission of false records on August 21, 2025 (¶¶ 156-160).

221.    Plaintiffs were damaged as a direct result of the conspiracy (¶¶ 172-178).

**PRAYER FOR RELIEF**

222.    **WHEREFORE**, Plaintiffs pray for judgment against all Defendants, jointly and

severally, for compensatory damages, punitive damages, and such other relief as the Court deems

just.

**COUNT VII**

**DEFAMATION BY IMPLICATION / FALSE LIGHT**

(Against All Defendants)

223.    Plaintiffs incorporate by reference the allegations contained in paragraphs 46-51

(identifying Defendants), paragraphs 125-132 (Armwood confronting Plaintiffs), and paragraphs

156-164 (Murray's transmission confirming fraud).

224.    When Armwood discovered discrepancies in the transcripts Plaintiffs had furnished,

Armwood confronted Plaintiffs—implying that Plaintiffs had altered the records (¶¶ 128-129).

225.    By transmitting records with identical falsifications on August 21, 2025 (¶¶ 161-162),

Defendants communicated the false implication that the transcripts Plaintiffs furnished were

authentic Freire records—making it appear that any discrepancies were caused by Plaintiffs, not

by Freire Schools.

226.    This placed Plaintiffs in a false light as people who would forge their children's

educational records.

227.    The false light was highly offensive to a reasonable person.

228.    Defendants acted with knowledge or reckless disregard for the falsity of the implication.

**PRAYER FOR RELIEF**

229.    **WHEREFORE**, Plaintiffs pray for judgment against all Defendants for compensatory

damages, punitive damages, and such other relief as the Court deems just.

**COUNT VIII**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

(Against All Defendants)

230.    Plaintiffs incorporate by reference the allegations contained in paragraphs 46-51

(identifying Defendants), paragraphs 88-106 (grade falsification), paragraphs 125-132

(Armwood confronting Plaintiffs), and paragraphs 172-178 (consequences).

231.    Under Florida law, IIED requires: (1) intentional or reckless conduct; (2) that is extreme

and outrageous; (3) causing severe emotional distress.

232.    Defendants' conduct was intentional—they deliberately falsified educational records

knowing the harm it would cause to Plaintiffs and their children (¶¶ 88-106, 165-171).

233.    Defendants' conduct was extreme and outrageous—falsifying children's educational

records, making parents appear to be forgers (¶¶ 128-129), threatening children's educational

44

futures with adult school placement (¶ 175), and causing loss of scholarship eligibility (¶¶ 176-177) exceeds all bounds of decency.

234.    Plaintiffs suffered severe emotional distress including anxiety, humiliation from being confronted by Armwood staff (¶¶ 128-129), and distress over their children's educational futures.

**PRAYER FOR RELIEF**

235.    **WHEREFORE**, Plaintiffs pray for judgment against all Defendants for compensatory damages, punitive damages, and such other relief as the Court deems just.

**COUNT IX**

**NEGLIGENCE**

(Against Defendant Freire Schools)

236.    Plaintiffs incorporate by reference the allegations contained in paragraph 46 (identifying Freire Schools), paragraphs 71-87 (Hedgepeth's authentic grade records), paragraphs 88-94 (Botwinik's parallel records), and paragraphs 172-178 (consequences).

237.    Freire Schools owed a duty to maintain accurate educational records for its students.

238.    Freire Schools breached this duty by:

a. Allowing network headquarters personnel (Botwinik) to create parallel records bypassing campus staff (¶¶ 91-94);

b. Failing to coordinate between Hedgepeth's authentic gradebook and Botwinik's fabricated transcripts (¶¶ 85-87);

c. Failing to verify accuracy before transmitting records interstate (¶¶ 165-171).

239.    As a direct and proximate result of Freire Schools' negligence, Plaintiffs' children have false information on their permanent educational records and face enrollment, placement, and scholarship consequences (¶¶ 172-178).

**PRAYER FOR RELIEF**

240.    **WHEREFORE**, Plaintiffs pray for judgment against Defendant Freire Schools for compensatory damages and such other relief as the Court deems just.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs DiWann Mathis and Marketa Mathis, individually and as parents and natural guardians of their minor children D.M. and D.M., respectfully pray that this Court enter judgment in their favor and against Defendants as follows:

A. Compensatory damages in an amount to be proven at trial, including but not limited to damages for lost educational opportunities, loss of scholarship eligibility, costs incurred to remedy false records, and emotional distress;

B. Treble damages pursuant to 18 U.S.C. § 1964(c) for Defendants' RICO violations;

C. Punitive damages against the individual Defendants (Davenport, Botwinik, Burgess,

and Murray) for their intentional, malicious, and outrageous conduct;

D. An order requiring Defendants to correct all falsified educational records for both D.M. (the older) and D.M. (the younger);

E. An order requiring Defendants to transmit corrected records with accurate GPAs to Armwood High School;

F. An order requiring Defendants to provide a written explanation to Armwood High School acknowledging that the falsified records originated from Freire Schools, not from Plaintiffs;

G. Pre-judgment and post-judgment interest as allowed by law;

H. Costs of suit, including reasonable attorney's fees pursuant to 18 U.S.C. § 1964(c);

I. Such other and further relief as this Court deems just and proper.

Respectfully submitted,
/s/ *DiWann M. Mathis*
DiWann M. Mathis
mathisadlitem@gmail.com

Dated: December 5, 2025

Respectfully submitted,
/s/ *Marketa I. Mathis*
Marketa I. Mathis,
mathisadlitem@gmail.com

Dated: December 5, 2025

**Plaintiffs DiWann Mathis and Marketa Mathis also appear as Parents and Natural Guardians of:**

D.M. (the older), a minor

D.M. (the younger), a minor

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DIWANN MATHIS and MARKETA MATHIS,**
individually and as parents and natural
guardians of minor children **D.M. and D.M.,**

Plaintiffs                                              C.A. No.

**v.**                                                    **JURY DEMAND**

**FREIRE SCHOOLS;**
**KELLY C. DAVENPORT**, in her individual capacity;
**LEIGH BOTWINIK**, in her individual capacity;
**OLIVIA BURGESS**, in her individual capacity;
**JAWANDA MURRAY**, in her individual capacity; and
**JOHN DOES 1-5** and **JANE DOES** 1-5, in their individual capacities,

Defendants

VERIFICATION

I, DiWann Mathis, declare under penalty of perjury that I have read the foregoing

Complaint, that the factual allegations therein are true and correct to the best of my knowledge,

information, and belief, and that this Complaint is not being presented for any improper purpose.

49

Respectfully submitted,

/s/ *DiWann M. Mathis*

DiWann M. Mathis

mathisadlitem@gmail.com

Dated: December 5, 2025

IN THE UNITED STATES DISTRICT COURT FOR

THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DIWANN MATHIS and MARKETA MATHIS,**
individually and as parents and natural
guardians of minor children **D.M. and D.M.,**

      **Plaintiffs**        **C.A. No.**

   **v.**             **JURY DEMAND**

**FREIRE SCHOOLS;**
**KELLY C. DAVENPORT,** in her individual capacity;
**LEIGH BOTWINIK,** in her individual capacity;
**OLIVIA BURGESS,** in her individual capacity;
**JAWANDA MURRAY,** in her individual capacity; and
**JOHN DOES 1-5** and **JANE DOES** 1-5, in their individual capacities,

      **Defendants**

**VERIFICATION**

   I, Marketa Mathis, declare under penalty of perjury that I have read the foregoing

Complaint, that the factual allegations therein are true and correct to the best of my knowledge,

information, and belief, and that this Complaint is not being presented for any improper purpose.

Respectfully submitted,

/s/ *Marketa I. Mathis*

Marketa I. Mathis,
mathisadlitem@gmail.com

Dated: December 5, 2025

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**DIWANN MATHIS and MARKETA MATHIS,**
individually and as parents and natural
guardians of minor children **D.M. and D.M.,**

|                      |                    |
|----------------------|--------------------|
| **Plaintiffs**       | C.A. No.           |
|                      |                    |
| **v.**               | **JURY DEMAND**    |

**FREIRE SCHOOLS;**
**KELLY C. DAVENPORT**, in her individual capacity;
**LEIGH BOTWINIK**, in her individual capacity;
**OLIVIA BURGESS**, in her individual capacity;
**JAWANDA MURRAY**, in her individual capacity; and
**JOHN DOES 1-5** and **JANE DOES** 1-5, in their individual capacities,

**Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on November 26, 2025, I served a true and correct copy of the foregoing

Complaint and Jury Demand upon Defendants, through their counsel of record, by electronic

mail at the following address:

**Counsel for Defendants:**
Kristen S. Swift, Esquire
222 Delaware Avenue, Suite 720
Wilmington, Delaware 19801
Email: kristen.swift@kaufmandolowich.com

53

Respectfully submitted,

/s/ *DiWann M. Mathis*

Dated: December 5, 2025

DiWann M. Mathis
mathisadlitem@gmail.com

Respectfully submitted,

/s/ *Marketa I. Mathis*

Dated: December 5, 2025

Marketa I. Mathis,
mathisadlitem@gmail.com

**Plaintiffs DiWann Mathis and Marketa Mathis also appear as**

**Parents and Natural Guardians of:**

    D.M. (the older), a minor

    D.M. (the younger), a minor